A. C. Moyer v. Commissioner. J. E. Moyer v. Commissioner.
Moyer v. Commissioner
Docket Nos. 22662 and 22663.
United States Tax Court
1950 Tax Ct. Memo LEXIS 44; 9 T.C.M. (CCH) 1043; T.C.M. (RIA) 50282; November 17, 1950
*44 R. J. Cleary, Esq., Farmers Bank Bldg., Pittsburgh 22, Pa., for the petitioners. Kalman A. Goldring, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: By these consolidated proceedings petitioners contest respondent's determination of deficiencies in income tax for 1944 as follows: Petitioner
Deficiency
A. C. Moyer
$10,546.31
J. E. Moyer
10,588.76
Each petitioner claims an overpayment. The only questions are whether deductions can be taken and, if so, their amounts in connection with a coal-stripping business conducted in the name of petitioners' father. The case was heard on a stipulation of facts and other evidence. Findings of Fact The stipulated facts are hereby found. Each petitioner filed a Federal income tax return for 1944 with the collector of internal revenue for the first district of Pennsylvania. Petitioners are brothers, and during the period in question were engaged in a general contracting business at Altoona, Pennsylvania. The business was conducted by a partnership, Moyer Bros., in which petitioners were equal partners. Work under the contracts included construction of buildings, *45 roadways, and bridges, and involved the use of bulldozers, shovels, and other large earth-moving equipment. Early in 1944 Moyer Bros. was engaged in building a roadway and bridge in Washington County, Pennsylvania. Work was terminated because of the steel shortage caused by the war, and part of Moyer Bros.' equipment and personnel was idle. In order to keep their organization together and the equipment in use, petitioners decided to have the equipment used in the coal-stripping business. Petitioner A. C. Moyer negotiated with a man named Elmer Ellis to obtain a lease on coal lands. In a letter to Moyer Bros., dated January 19, 1944, Ellis enclosed a copy of a proposed lease, not executed. Martin Goodman, attorney for Moyer Bros., examined the lease and advised that the name Moyer Bros. be stricken. At that time Moyer Bros. was indebted in connection with its general contracting operations to Reconstruction Finance Corporation and under the terms of the loan was prohibited from engaging in other businesses. By agreement of petitioners' father, E. J. Moyer, the name "E. J. Moyer" was substituted for Moyer Bros." in the proposed lease which was executed on January 26, 1944, by Nelle *46 and Elmer Ellis as lessors and E. J. Moyer as lessee. By a letter of the same date on Goodman's letterhead, Nelle and Elmer Ellis wrote to E. J. Moyer as follows: "In connection with the agreement that we have executed with you this day and in order to avoid the necessity of rewriting the same in order to clarify a few minor matters, we are writing you this letter confirming our oral understanding. * * *
"3. We agree that we will accept and consider as payment by you, checks of Moyer Bros., as payment of the royalties and other matters for which payment is provided for in said agreement, in lieu of your own checks, should it be later decided by you that you desire payment to be made in this manner. * * *
"* * * will you please endorse your approval of this understanding at the bottom of this letter." E. J. Moyer added his signature to the bottom of the letter as "Approved." By a written "Letter of Attorney," dated February 3, 1944, signed by E. J. Moyer "Trading as E. J. Moyer Coal Company," petitioner A. C. Moyer was appointed attorney to "perform all matters * * * in connection with the operation of my coal stripping business * * *, including the right to sign *47 all contracts, notes, leases, bills of sale or any instruments whatever in connection therewith * * * in the same manner and to the same extent as I could if personally present; hereby ratifying and confirming whatsoever my said attorney shall and may do by virtue hereof. In connection with my said coal stripping operation, I do hereby designate my son, A. C. MOYER * * * as the general manager in full charge of said coal stripping operation." Prior to the period in question, E. J. Moyer had operated a blacksmith shop and a garage business. Since about 1937 he had been employed by Moyer Bros. in its lumbermil as a mill and cabinet worker. A written lease of additional land for coal stripping was executed on October 14, 1944, by American Trustee & Transfer Corporation, Trustee, as lessor and "E. J. Moyer, trading and doing business as E. J. Moyer Coal Company, by A. C. Moyer, Attorney-in-fact" as lessee. The coal-stripping business was not registered under the Fictitious Names Act of Pennsylvania. In 1944 a checking account in Altoona Trust Co. was opened in the name of E. J. Moyer Coal Company, with the only "authorized signature" that of "A. C. Moyer, General Manager." E. J. *48 Moyer signed no checks on the account. In 1944 petitioners desired to obtain a loan from Reconstruction Finance Corporation of $430,000 to finance a project in Charleston, West Virginia. By a written bill of sale dated August 14, 1944, "E. J. Moyer, Trading as E. J. Moyer Coal Co. * * * hereby bargain and sell the following equipment unto Moyer Brothers": 1
P. & H. 1 1/2 yeard Dragline
1
Lorain 3/4 yard shovel
1
D-7 caterpillar bulldozer
1
Model K Allis Chalmers B D
1
lot of small tools and equipment
1
lot of repairs and supplies The bill of sale was signed by E. J. Moyer. By a written agreement dated August 14, 1944, "Moyer Brothers * * * leased" to "E. J. Moyer trading as E. J. Moyer Coal Co." the same equipment listed in the above bill of sale. The lease was for a term of one year at rental of $25,000 payable in 12 monthly installments. The payments were "provided for in a demand note given by the party of the second part [E. J. Moyer] * * * in the full amount of $25,000 but which is intended to be paid in accordance with the terms of this lease contract." The agreement was signed by A. C. Moyer for Moyer Brothers and E. J. Moyer for E. J. Moyer *49 Coal Co. By a written promissory note dated August 14, 1944, and signed by E. J. Moyer for E. J. Moyer Coal Co., the promissor agreed to pay Moyer Brothers $25,000 on demand. As security for the $430,000 loan from Reconstruction Finance Corporation Moyer Brothers assigned to it the $25,000 note of August 14 from E. J. Moyer; the lease agreement of August 14 between E. J. Moyer and Moyer Brothers; and the bill of sale dated August 14. In a letter from the manager of Reconstruction Finance Corporation's Philadelphia office dated September 19, 1944, E. J. Moyer was notified of the above assignments and asked to confirm - "* * * (1) that you are an individual doing business as E. J. Moyer Coal Co., and that you are registered to do business as such under the Fictitious Names Act; (2) that the Note given and executed by you to Moyer Brothers, dated August 14, 1944, in the amount of $25,000 is your obligation, valid and binding against you in the hands of Moyer Brothers or their assignees, subject to no defenses, counter-claims or set-offs, and the face amount thereof is still due and payable; (3) the Article of Agreement dated August 14, 1944, is still in full force and effect, has *50 not been terminated, and is your act and deed, and the payments to which you obligate yourself thereunder are not the subject of any counter-claim, demand or set-off by you, have not been attached, and have not been assigned except to Reconstruction Finance Corporation, and you have made no advances or payments thereon." At the bottom of the letter E. J. Moyer endorsed his signature, acknowledging that "your understandings in connection with the collateral are true and correct." In an affidavit executed in connection with the assignment to Reconstruction Finance Corporation, petitioner A. C. Moyer, designating Moyer Brothers as "borrower" and Reconstruction Finance Corporation as "lender," declared that: "* * * Borrower, at the time of its execution of the aforesaid Assignment Agreement, was the true and lawful holder in due course of the said Note without any defenses or counterclaims thereto on the part of the maker of the Note or on the part of anyone; the face amount of the said Note, that is, $25,000 is still due and payable and there has been no separate assignment or endorsement over or transfer of the said Note to anyone except to Lender; the Article of Agreement is still *51 in full force and effect, has not been cancelled or terminated, nor amended or modified, and no payments thereunder have been made as yet to Borrower by E. J. Moyer, trading as E. J. Moyer Coal Co.; all of the machinery and equipment referred to in the Article of Agreement and referred to on the Bill of Sale are owned by Borrower, and the only rights thereto on the part of anyone are those of E. J. Moyer, trading as E. J. Moyer Coal Co., by virtue of the said Article of Agreement." The ledger of Moyer Bros. contained an account designated "E. J. Moyer Coal Company." A set of books in the name of E. J. Moyer Coal Co. consisting of four journals and two ledgers was kept by employees of Moyer Bros. The ledger accounts disclose payments in 1944 of $8,837.84 as rent under the coal leases. The transactions connected with the coal-stripping business were reflected either in the "E. J. Moyer Coal Company" account on the books of Moyer Bros. or at various places in the books kept in the name of E. J. Moyer Coal Co. The net debits in the former account as of December 31, 1944, in the amount of $35,221.23, were charged by Moyer Bros. to Profit and Loss as bad debts. In its partnership return *52 for 1944 Moyer Bros. claimed a deduction of the $35,221.23 for bad debts. The return reported "Ordinary net income" of $27,623.12, distributable $13,811.56 to each petitioner. In their individual income tax returns for 1944 each petitioner reported a taxable income of $13,811.56. In his notice of deficiency respondent increased the taxable income of each petitioner by amounts held to represent - "(a) Additional taxable income from the partnership of Moyer Brothers, due to the disallowance of deduction for a bad debt and excessive taxes." Petitioner A. C. Moyer filed a "Protest Against Proposed Increase In Income," notarized on January 30, 1948, in which he designated "Moyer Bros." as "taxpayer." The protest reads in part: "Taxpayer erred in reporting the item as it did. As a matter of fact the transactions involving the so-called 'E. J. Moyer Coal Company' were nothing more than transactions involving the partnership of Moyer Bros. and should have been and were, in part, so reported on the 1944 Partnership Return of Income of that partnership. Instead of showing the so-called 'Bad Debt' of $35,221.23 Taxpayer should have shown among its figures on Moyer Bros. a loss on the operation *53 of the so-called 'E. J. Moyer Coal Company,' which was nothing more than part of the operations of Moyer Bros., of $52,580.60. There are hereinafter set forth data showing in detail the basis of Taxpayer's claim." Petitioners now contend that Moyer Brothers was entitled to deduct $46,108.36 as a loss sustained by the coal-stripping business. The coal-stripping enterprise and any income or loss resulting from it belonged to E. J. Moyer, and not to petitioners. After the first coal lease was executed some of petitioners' equipment was moved from the abandoned roadway and bridge project to the site of the coal-stripping operation, including two shovels, a bulldozer, trucks, and small tools. It was necessary to remove 25 to 35 feet of "overburden" partially composed of 8 to 25 feet of hard "sand rock," in order to reach the coal. The "sand rock" had to be blasted before removal. To provide sufficient equipment to move the "overburden," there were purchased during 1944 six items of large machinery, several small tools, and other equipment. The six items of equipment were acquired under separate written contracts of sale dating from February 5 to November 14, 1944. Except for the *54 contract under which the dragline was sold, in which the purchaser was designated "Moyer Bros.," each of the items was sold to "E. J. Moyer Coal Co." The contract for the Allis-Chalmers Bulldozer was executed by "E. J. Moyer" as "Owner." The remaining contracts were signed by petitioner A. C. Moyer as "General Manager." In the case of both the Bucyrus-Erie Shovel and the D-8 Tractor, a series of promissory notes was executed, one note for each monthly installment payment. The notes for the Bucyrus-Erie Shovel were executed by "A. C. Moyer, Atty. in Fact" and by "A. C. Moyer." The notes for the D-8 Tractor were signed "A. C. Moyer General Mgr." The other items were also purchased on the installment plan with down payments ranging from $400 to $2,655 and balances (payable to 10 or 12 equal monthly installments) ranging from $4,044 to $10,104. Of the six items, all except the D-8 tractor were purchased second hand. The D-7 tractor and dragline were about 6 and 10 years old, respectively, when acquired. Each item was worked in the coal-stripping business on two ten-hour shifts each day. The Allis-Chalmers bulldozer and the dragline were too small to work effectively in the type of overburden *55 present in the coal-stripping enterprise, and for that reason sustained more than ordinary wear and tear. Operation of the former was continued in 1945 and 1946, and the latter was finally junked in 1946. All six items of large machinery received rough use. Petitioner A. C. Moyer, who was familiar with the operations and capabilities of each of the six items, estimated the periods of useful life at the time of acquisition and the amount of the useful life exhausted as of the close of 1944 for some of the items as follows: Years of
Fraction
Useful Life
Exhausted
When
As of Close
Item
Acquired
of 1944
Allis-Chalmers Bull-
dozer
3
More than 1/3
D-7 Tractor
2
Complete
Dragline
2
*
Lorain Shovel
*
1/3
D-8 Tractor
2
*
Bucyrus-Erie Shovel
2
*
The small tools and equipment were purchased by petitioners during 1944 at a cost of $390.50. They were used extensively in the coal-stripping business, and received rough wear. Petitioner A. C. Moyer estimated a useful life of three years for the small tools and equipment from the date of acquisition. In its partnership income tax return for 1944 *56 Moyer Bros. did not claim a deduction for depreciaion on its six items of large machinery. Depreciation was sustained in connection with the large machinery during 1944, as follows: Estimated
Item
Acquired
Cost
Useful Life
Allis-Chalmers
Bulldozer
8-14-44
$ 4,544.00
3 years
D-7 Tractor
8-14-44
5,452.00
2 years
Dragline
2-21-44
12,104.00
2 years
Lorain Shovel
8-14-44
5,902.00
3 years
D-8 Tractor
10-30-44
10,575.00
2 years
Bucyrus-Erie
Shovel
10-30-44
14,721.35
2 years
In connection with the coal-stripping business, construction of a tipple, roadway, and railroad siding was required. Fifteen employees of Moyer Bros. were used in the construction work. In addition, materials were used in building the tipple, and Moyer Bros.' trucks were employed in the roadway operation. Petitioner A. C. Moyer, who was familiar with all phases of the construction, allocated the costs of labor, materials, and trucking time as follows: Railway
Expense
Tipple
Roadway
Siding
Labor
$1,867.00
$1,084.55
$431.80
Materials
2,357.96
Trucking Time
350.00
Totals
$4,224.96
$1,434.55
$431.80
The tipple, roadway, *57 and railroad siding belonged to Moyer Bros. and each had an estimated useful life, for depreciation purposes, of three years. A reasonable allowance for depreciation on the three items for 1944 was $704.04. Opinion Although there is a discrepancy between the written records and the oral testimony, we prefer to rely on the former as being contemporaneous, more specific, and more reliably reflecting the true intention of the parties at the time. See ; Schmitt v. William G. Johnston Co. (Pa. Super.), ; , affirmed per curiam (C.C.A., 3rd Cir.), . Petitioners' contract with the R.F.C., the agreement with the owners of the coal mine, the power, of attorney given by petitioners' father and petitioners' books of account all treat the transaction as belonging to the father. The books, and from them petitioners' tax returns, concluded that there was a bad debt due from the father to petitioners for the losses sustained in the enterprise. For reasons of which were are not apprised, *58 but which may be because worthlessness could not be shown, this claim is now abandoned. We should more readily have been able to deal with the transaction as so described and are unable to accept the evidence of a nebulous oral conversation as being sufficient to change this conclusion. And even though petitioners' organization may have contributed some unspecified services, there is no reason to assume that the coal lease, of which the father was the apparent owner, would not have been the principal income-producing factor. We have accordingly found as a fact that the coal-stripping enterprise belonged to the father. It follows that the loss resulting from it did not constitute a deductible business expense of petitioners. See . It is not inconsistent with this that some of the property used in the enterprise was owned by petitioners and that they are entitled to depreciation on it. Appropriate figures with respect to this are contained in the findings of fact, which are dispositive of all remaining controversies. Decisions will be entered under Rule 50. Footnotes
*. No evidence appears in the record.↩